JoNes, Chief Judge,
delivered the opinion of the court :
Plaintiff sues for a return of $16,615.50 which it deposited with its bid for the purchase of two tracts of land belonging to the defendant, the latter acting through the Public Housing Administration.
*543 By deed dated March 23, 1942, the defendant purchased several tracts of land including the two parcels in question from the Title Holding Company of Baltimore, Maryland. Prior to deeding this land to the Government, the Title Holding Company had, on December 16, 1941, executed a deed or instrument which conveyed to the State of Maryland for the use of the State Roads Commission all and every right of vehicular egress and ingress between a proposed highway to be known as Martin Boulevard and certain abutting land of which parcels 2 and 8 involved here were a part. The transfer deed or instrument permitted roadways to be connected with the proposed highway at two specific points. The deed was recorded in the land records of Baltimore County on March 20, 1942.
The defendant purchased these various tracts to be used as a part of a federally owned housing development called Victory Villa. Victory Villa had been constructed during World War II for the war production workers.
The defendant issued circulars which were published and distributed by the defendant to prospective purchasers, including the plaintiff, for the purpose of inducing bids. Two of the circulars which are in evidence as plaintiff’s exhibits Nos. 1 and 2. described various contiguous tracts of land. Included in these two circulars were two tracts known as pax-cel 2, section 1,-'containing approximately'24 acres of -land, and parcel '8, section 2, containing approximately T7 acr-es of land. The circulars gave -.a rather florid description of these tracts as a part of an established .expanding Baltimore community. One of the circulars describing the lots advertised for sale contained the following:
Victory Villa is located in the heavily populated residential and industrial area of Middle River, less than a mile off Highway 40 * * * Martin Blvd. cuts directly through the community, and several of the parcels front on this main thoroughfare. Although zoned residential now, there is every reason to believe that certain parcels or parts of parcels under consideration have definite and considerable potential commercial use.
On February 23, 1956, the defendant filed in the office of the Clerk of the Court of Baltimore County and had recorded *544 in the records of the County three plats of Victory Villa which had been approved by the Baltimore County Planning Board. These plats correctly showed that Martin Boulevard bordered on one side of parcel 8 but there was no indication that parcel 8 had no direct access to Martin Boulevard. The plat showed an intervening parcel of some 29 acres between 400 and 650 feet wide between parcel 2 and Middle Ei ver Eoad. Parcel 2 was shown to border on Compass Eoad.
In the late summer of 1956 the defendant, acting through the Public Housing Administration, entered into a contract with a professional advertising agency authorizing such agency to prepare newspaper and circular advertisements with sketches, showing various parcels of land, including parcels 2 and 8 in issue here, which defendant had for sale and on which it would receive bids. Included in one of the advertisements was a sketch which showed' both parcels 2 and 8, as well as other parcels in Victory Villa. Parcel 2 was shown abutting on an unnamed road on the eastern side of the parcel, although the recorded plats had shown an intervening parcel between that parcel and Middle Eiver Eoad, which was the first road east of parcel 2. The sketch correctly showed parcel 8 abutting Martin Boulevard but with no indication that Martin Boulevard was a limited access highway. Pertinent provisions of the advertisements are set out in findings 7 and 8. These stated the sealed bids would be opened December 28, 1956, at the Washington Ee-gional Office of the Public Housing Administration. One of the advertisements was headlined as follows:
POR SALE : CHOICE GOVERNMENT OWNED PROPERTY IN ESTABLISHED, EXPANDING BALTIMORE COMMUNITY '
INDIVIDUAL LOTS AND LARGER PARCELS WITH TREMENDOUS . RESIDENTIAL OR COMMERCIAL . POTENTIAL. . ... . LOCATED IN VICTORY. VILLA NEAR GLENN L. MARTIN PLANT.
The advertisement stated that Victory'Villa was located in a heavily populated residential and industrial area only a few minutes from Baltimore City limits, and that “Martin Blvd. cuts directly through the community,. and several of the parcels front on this main thoroughfare.” The advertisements further stated that while the property was zoned as residential then, there was every reason to believe that certain of the parcels had definite and considerable potential *545 commercial use, and that bids would be accepted on any one parcel, or any combination of parcels, or on all of the 18 parcels.
A vice president of the plaintiff company, a Mr. Colvin, having read the ads wrote for bid forms and other information concerning the property for sale. A similar request was made by Mr. Blacker, also a vice president of the plaintiff corporation, for bid forms, sales map, and other information regarding the subject offer.' In response, the defendant mailed to the plaintiff a sales package consisting of the general conditions of sale, bid forms, sales maps, and advertising circulars similar to the ones that had been .published. "The sales maps, about 2 by 2%. feet in size, showed the various parcels offered for sale, with the streets which bordered them. The sales map showed parcel 2 with an intervening parcel between it and the Middle River Road. Another map showed Martin Boulevard bordering one side of parcel 8 but there was no indication on the sales map or in any of the material in the sales packet that parcól 8 had no direct access to Martin Boulevard.
By that time Martin Boulevard, which borders on the northern side of parcel 8 for a total distance of about 1400 feet was a heavily traveled, 50-mile-an-hour speed limit, four-lane, divided highway running east and west between Route 40, known as Pulaski Highway, and Eastern Boulevard in Baltimore County. Martin Boulevard, had been built immediately preceding World War II and was the first limited áccess road ever built in Maryland. Parcel 8 which contains'77.22 acres was basically level with Martin Boulevard. There were no fences between parcel 8 and Martin Boulevard. ...
The plaintiff bid on three parcels, including parcels 2 and 8.. It deposited $16,6¡15.50. - This amount is still held by the defendant and plaintiff sues for its recovery, asserting that the defendant through its regularly employed and approved advertising agency had misrepresented the property and that specifically it failed to disclose that there was no access by vehicle permitted from .parcel 8 to the main artery of traffic known as Martin Boulevard, although it fronted on that boulevard for a distance of 1400 feet.
*546 The defendant claims that plaintiff, by searching the deed records, could have been fully advised of the fact that vehicular access to the main highway had been closed and deeded away. It not only denies plaintiff’s right to recover the deposit but also files a counterclaim for more than $100,000, claiming it was compelled to sell the property at that amount below what plaintiff had bid for the two parcels in question.
The plaintiff had bid $277,200 for parcel 8 and $50,100 for parcel 2. (It had included a bid of $5,010 for a third parcel, classed as parcel G, but this part of the bid was rejected and is not involved in this controversy.) The plaintiff submitted its bid on December 24, 1956. The bid form as filled out is shown in finding 16. The general conditions of the sale are set out in findings 17 and 18. Paragraph 8 of the general conditions stipulates that
The Purchaser shall have thirty days from the date of mailing the notice of acceptance to examine the title to the lands which are the subject of his accepted offer and satisfy himself as to the nature of such title. If it is found that the title is not marketable (except for restrictions, covenants or easements of record, compliance with zoning or building codea), and the Seller does not cure the objections thus presented to it by the Purchaser within 60 days thereafter if within its power so to do within such period of time, the Purchaser may withdraw from the purchase of the Property and may obtain a refund of all payments previously made. The failure of the Purchaser to furnish an opinion of a qualified title attorney within said thirty days of mailing notice of acceptance, showing that the title is not marketable (except for restrictions, covenants or easements of record, and compliance with zoning or building codes), shall be deemed to be a waiver on the part of the Purchaser as to all title defects.
Before submitting the bid in question, Mr. Colvin, accompanied by a superintendent and his civil engineer, a Mr. Armácost of a firm which did engineering work for plaintiff, inspected the property at Victory Villa. Plaintiff’s bid was the highest for parcels 2 and 8. By letter dated January 8, 1957, defendant accepted plaintiff’s offer as to parcels 2 and 8.
*547 Mr. Colvin was experienced in purchasing land for development, but had never before purchased land from the defendant. He had, however, bid on such land. He was familiar with the general area. He did not know, and it was not common knowledge, that Martin Boulevard was a limited access highway. He checked with the county engineering department as to sewer lines but did not inquire of the State Hoads Commission, where records were kept as to such matters. He relied on representations made by the advertisement. He did not check the land records.
On January 12, 1957, Mr. Colvin, Mr. Eomans and Mr. Armacost made another inspection of Victory Villa. Shortly before this inspection, Mr. Armacost procured the record plats which showed the correct location of Middle Eiver Eoad with respect to parcel 2. At that time Mr. Armacost discussed with Mr. Colvin the laying of a service road on parcel 8, but on January 14, Mr. Armacost was informed in a telephone conversation with the assistant engineer of the Maryland State Eoads Commission that Martin Boulevard was a limited access highway and that parcel 8 did not have direct access to Martin Boulevard. This is the first time this information had come to Mr. Armacost’s attention.
There followed some discussion and some letters which are set out in findings 23 and 24.. It appears that at some time between January 11 and January 14, Mr. Colvin was informed in a telephone conversation with an official of the Title Guarantee Company that Martin Boulevard was a limited access highway. This was the first time this information had come to Mr. Colvin’s attention.
After some further efforts and conversation, the plaintiff, on February 4, 1957, wrote the defendant that its attorneys felt that at this time the title was not marketable so they asked for an additional 10 days in which to decide. The additional 10 days were granted by letter dated February 7, 1957. On February 7, 1957, the plaintiff’s title attorney wrote a letter to the defendant stating that the title was not good and marketable in accordance with the provisions and representations in the prospectus circulated by the seller; that parcel 8 did not contain the acreage represented in the prospectus and for all practical purposes did not front on *548 Martin Boulevard as represented. Additional correspondence between the parties is set out in findings 33 to 40, inclusive.
As a result the plaintiff refused to make settlement on parcels 2 and 8, and defendant retained ■ plaintiff :s deposit and again advertised the property for sale but in a form differing from the original advertisements. The property in issue was sold on June 10, 1957, to the Trailer Village Corporation. Parcel 2 was sold for $24,675 and parcel 8 for $182,272. This was a net amount of $120,353 less for the two parcels than the amount which the plaintiff had bid. Counsel for both sides have agreed that this was the best sale that could be made.
Plaintiff’s real estate expert, Mr. Dance, who had been an appraiser in Baltimore County since 1915, and had done considerable work in the area of Victory Villa, testified that the value of parcel 8 would be from $3,500 to $4,000 an-acre if it had full access to the eastern boundary of Martin Boulevard and assuming that it could be zoned as commercial, but that without access to Martin Boulevard the value would be $2,000 an acre.' He further testified that "on the same assumption parcel 2 would be about $2,000 per acre with access to' Middle River Road, but without such frontage it would be $1,500 an acre. Mr. Williams, president of Trailer Village Corporation, testified that with access parcel 8 would have “some” increase in value, but did not give definite figures.
The record appears rather clear to the effect that the property in question would have been of substantially greater value had parcel 8 had access to Martin Boulevard and had parcel 2 had access to Middle River Road, and had the property been as indicated in the advertisements and sketches and maps shown in the sales literature.
The question really turns on whether the defendant had information which it was its duty to disclose; whether the plaintiff had a right to rely, as it contends, on the statements, representations and map locations indicated in the advertisements and circulars, or whether plaintiff had the obligation before bidding or before entering into a contract to examine the land records which would have disclosed the complete deeding away of vehicular ingress and egress to Martin *549 Boulevard; and also whether a good and marketable title was shown for the purposes for which the land was purchased by the plaintiff and for which the circulars and advertising material indicated it was suitable. These questions involve a consideration of the prevailing circumstances and conditions as revealed in the record.
The plaintiff insists that the term ‘‘front on” means contiguous to and that in its ordinary acceptance and meaning would indicate the right of egress to and from the highway which is in issue. “Fronting and abutting property, as the term is frequently used in street improvement statutes means that property between which and the improvement there is no intervening land.” [Ballentine’s Law Dictionary (citing City of Wilmington v. McConnell, 249 Pac. 708), 4th ed., 533.]
“ ‘Fronting’ signifies abutting, adjoining, or bordering on, depending largely on the context.” [Black’s Law Dictionary, 4th ed., 797, citing cases.]
According to the laws of Maryland, where this property is located, ordinarily title to property adjacent to, abutting, on, or fronting on a public highway or street includes an inherent right of access to such highway or street. Huebschmann v. Grand Company, 166 Md. 615, 628, 172 A. 227; State Roads Commission v. Franklin, 201 Md. 549, 95 A. 2d 99. On this particular point the defendant cites the case of Stanley Co. of America v. McLaughlin, 195 F. Supp. 519, which is to the contrary. However, this applies to the District of Columbia in which the national government has a special interest.
We believe that the term “front on” means directly contiguous to and adjoining and normally carries with it access to and from the road or street on which it fronts. This is especially true in the instant case since the map, sketch, and drawing furnished by the defendant indicates that for a distance of several hundred yards the property was contiguous to the main highway artery. There is uncontra-dicted testimony that in Maryland the term “front on” includes access to the road or street. It is a well recognized principle that ordinary words should be interpreted in the average everyday sense in which they are commonly used. *550 Hanover Bank v. Commissioner, 369 U.S. 672, 687; Crane v. Commissioner, 331 U.S. 1, 6.
The plaintiff takes the position that the defendant did not furnish a good marketable title. According to the decisions and in the usual sense a good marketable title means free from any encumbrance or restriction. In this particular instance .the question is further complicated by the fact that the deed which the Title Holding Company had transferred to the State of Maryland was apparently more than an easement. It was not only a permanent interest in the property involved but also affirmatively deprived any subsequent purchaser of rights which normally inhere in property that is subject to an easement. Here it must be noted that the bidding form promised that if the title is not marketable (except for restrictions, covenants or easements of record, compliance with zoning or building codes) the bid might be withdrawn The defendant strongly insists that this is sufficient notice of any previous transfer or restriction that might have been placed upon the land and of record before the bids were made.
There is a serious question of whether a good marketable title existed in the sense in which the circulars, sketches, drawings and other sales literature would lead a prospective purchaser to expect. Of course, almost any piece of property is salable at some price but certainly the matter must be considered in the light of all the facts and circumstances..
All of these questions are somewhat wrapped up in the ultimate issue as to whether the plaintiff had a right to rely upon the representations made by the representative of the defendant, whether the defendant had information which it was its duty to disclose and which it did not disclose, and whether in all the circumstances the plaintiff had sufficient notice to require him to investigate all the record papers before submitting a bid.
We recognize that- a certain amount of- puff- or’ trade talk is permissible in promoting the sale of any property. However, the circulars and ads taken as a whole are rather colorful in their style and go considerably beyond ordinary representations as to property. They seemed almost as lyrical as a torch song. The headline circular depicted a *551 choice Government-owned property in an established expanding Baltimore community. The map showed close proximity to a main highway, accompanied by the suggestion that it was potentially commercial property; also included was a sketch or drawing of Victory Villa including parcels 2 and 8 lying on the east and west sides of Martin Boulevard and south of Pulaski Highway. It was declared in advertisements that Martin Boulevard cuts directly through the community and several of the parcels front on this main thoroughfare. These statements seem to us to go far beyond ordinary puff or trade talk customarily permitted.
The defendant’s representatives stated that as to the tracts in question “all facilities are readily available, including water and sewerage owned by Baltimore County, and these lots are ready for immediate construction.”
We like to think that when the Government makes a representation to its citizens its declaration can be relied upon. This is as it should be. When direct representations are made a prospective purchaser is entitled to act upon the assumption that the representations áre correct.
We are persuaded to believe it is highly improbable that career officials of the Government would have made the statements that were made in the advertising literature which was freely and thoroughly distributed, or that such officials prepared them. Yet some officials saw fit to employ an advertising and sales agency which seemed primarily interested in consummating sales and not very much interested in what the purchaser might find after the sale had been made.
While there is some conflict in the evidence as to whether a prospective purchaser bidding on the purchase of property customarily investigates all the records for title before submitting a bid, the more credible testimony indicates that when a bid is submitted, especially in dealing with the Government, it is customary to have a provision for later examination as to title. This was the method employed here. All these, details indicate that the plaintiff was not required as a matter of law and fact to make sure the title was complete and unrestricted before he submitted a bid. The stipulation in the bid form and bid information prepared by the defendant’s representa *552 tives all provided for sufficient time for complete investigation and furnishing of adequate title.
While the plaintiff was apparently somewhat careless, we find that the circulars, ads, sketches, drawings, and maps were calculated to make the prospective purchaser believe, and that it did believe, that parcel 8 had complete frontage of 1400 feet on Martin Boulevard, and that parcel 2 was contiguous to another highway; and that plaintiff was justified in believing, in the light of the entire record, that purchase of the property in question carried with it ordinary ingress and egress privileges to the owner of the land.
We find that the clause in parentheses in the bid information in reference to marketable title “except for restrictions, covenants or easements of record, compliance with zoning or building codes” hidden away in a wilderness of sentences was not sufficient to put the purchaser on notice that before Submitting a bid he must check on all the statements made by a representative of the Government. This is especially true since this was the first limited access highway ever built in Maryland. [Finding 11.]
Mr. Colvin, the vice president of the plaintiff, testified in part as follows:
I went out and looked at the property, checked the availability of sewer, walked over the topography, checked it roughly from the advertisement that was in the Evening Sun and also sent to me by the United States Government and * * * read the advertisement, saw the frontage on Martin Boulevard, the approximate frontage on Middle Biver Boad on the two parcels and then figured out what the property was worth after that, based on the advertisement and looking at the property and the locations of it. [Finding 6.]
We find also that in the light of the purposes,for which the plaintiff was purchasing this property and in the. light of the conclusions that an ordinary purchaser would reach from the statements made in the glowing literature that, was presented by the advertising and sales agency that a good and marketable title was not furnished to the plaintiff, and that the plaintiff was justified in withdrawing its bid and refusing to complete the purchase of the property.
We are not finding that the officials of the Public Housing *553 Administration deliberately made these representations or that they drew the circulars, advertisements, and sketches. This was done by a professional advertising agency. However, the resulting advertisements were approved by the defendant, were published in newspapers and submitted in circular form' to prospective bidders, including the plaintiff. They never repudiated them. Perhaps they enjoyed reading them. The defendant, therefore, must be bound by the actions of and the statements by the duly authorized agency. Certainly this is true when the defendant is seeking affirmative action to carry through with a bid in the circumstances shown by this record or in lieu thereof to secure more than $100,000 in a counterclaim, including a retention of the earnest money that was deposited.
The defendant insists that regardless of the finding as to parcel 8, plaintiff should be held to the purchase of parcel 2, and consequently to the damages flowing from its refusal to consummate its purchase of that tract. However, the purchase was made as a unit for a housing development project. The bid was accepted as to the two tracts together. Parcel 2 was a much smaller tract and it is doubtful if a building development concern could organize economically to develop the smaller tract alone. At any rate, the bidding and acceptance were as to both tracts and they should be considered together as one purchase.
Plaintiff is entitled to recover the sum of $16,615.50, and judgment will be entered to that effect. The defendant’s counterclaim, is dismissed.
Reed, Justice (Ret.), sitting by designation; Davis, Judge; DtjReee, Judge; and LaRamore, Judge, concur.
FINDINGS ÓE FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a Maryland corporation with its principal office in Baltimore, Maryland, is and was at all pertinent times one of a number of corporations owned by Mr. Victor Posner who, under the name of Victor Posner Developments, is one of the largest real estate developers and home builders *554 in the Baltimore County area. The overall management of Mr. Posner’s corporations in the Baltimore County area was at all pertinent times performed by Mr. Melvin Colvin who is a vice president and assistant secretary of plaintiff corporation and an officer in Mr. Posner’s other above-mentioned corporations. The office manager of Victor Posner Developments was at all pertinent times Mr. Leonard H. Blacker who was also a vice president of plaintiff corporation.
2. Plaintiff’s claim is for $16,615.50 which is the sum deposited by plaintiff with defendant, acting through the Public Housing Administration, and retained by defendant in connection with plaintiff’s offer to buy certain land owned by defendant in Baltimore County, Maryland, including two sections (hereinafter referred to as parcel 2 and parcel 8) of 24 and 77.22 acres, respectively, which were part of Victory Villa, a federally owned housing development constructed during World War II for war production workers. Defendant’s counterclaim is for damages allegedly incurred by defendant because of plaintiff’s refusal to make settlement on the above-mentioned land.
3. On December 16,1941, a deed was executed by the Title Holding Company, a body corporate and predecessor in title of the United States, which conveyed forever unto the State of Maryland to the use of the State Roads Commission of Maryland all and every right whatsoever of vehicular egress and ingress between a proposed highway, subsequently known as Martin Boulevard, and certain abutting land of which parcels 2 and 8 were a part, except that the Title Holding Company was, by the deed, to be permitted roadways 'to the proposed highway to connect at two specific points. The deed was recorded in the land records of Baltimore County on March 20, 1942.
4. By deed made and recorded in the land records of Baltimore County on March 23,1942, the Title Holding Company conveyed unto the United States certain land of which parcels 2 and 8 were a part, subject, however, to various easements and grants recited in the deed, including easements granted by the Title Holding Company to the State Roads Commission. Under date of March 24, 1942, defendant received a certificate of title from the Title Guarantee and *555 Trust Company of Baltimore, Maryland, certifying that the above-mentioned land was free and clear of all encumbrances, defects, interests, and all other matters whatsoever, either of record or otherwise known to the Title Guarantee and Trust Company, impairing or adversely affecting the title to the land, except as shown in an attached schedule which showed among other things the above-mentioned easements granted by the Title Holding Company to the State Eoads Commission.
5. On February 23, 1956, there were filed by defendant in the office of the Clerk of Court of Baltimore County and recorded in the records of Baltimore County three plats of Victory Villa which had been approved by the Baltimore County Planning Board. Martin Boulevard was correctly shown bordering one side of. parcel 8, but there was no indication that parcel 8 had no direct access to Martin Boulevard. It is not a customary practice in Baltimore County for such recorded plats to show the denial or limited access of a piece of property to an adjacent road. An intervening parcel of 29.6 acres, estimated to be from 400 to 650 feet wide, was correctly shown between parcel 2, which consisted of 24 acres, and Middle Kiver Koad.. Parcel 2 was correctly shown to border on Compass Eoad.
6. In the late summer of 1956 defendant, acting through the Public Housing Administration, executed a contract with a professional advertising agency to prepare newspaper and circular advertisements with sketches, showing various parcels, including parcel 2 and parcel 8, which defendant had for sale-and on which it would receive .. bids.- At-the time the contract was executed defendant, through its agent, knew in fact that Martin Boulevard was a limited access highway and so informed the advertising agency. The resulting advertisements were approved by defendant, and were published in newspapers and distributed in circular form to prospective bidders, including plaintiff.
7. One of the advertisements, approximately letterhead size, contained a sketch of about 4 by 4 inches which showed both parcel 2 and parcel 8, as well as other parcels in Victory Villa. Parcel 2 was shown abutting an unnamed road on the eastern side of the parcel when in fact, as set forth in *556 the recorded plats (finding 5, supra), there was an intervening parcel between parcel 2 and Middle River Road which was the first road east of parcel 2. The sketch correctly showed parcel 8 abutting Martin Boulevard but with no indication that Martin Boulevard was a limited access highway. A designation'of a new-sewer line-was shown on. the sketch. The advertisement listed each parcel which was for sale, together with its acreage and the terms of sale, and contained in part the following language:
Bidding will be accepted on any one parcel, any combination of parcels, or all parcels.
❖ ❖ * # £
SEALED BIDS WILL BE OPENED DECEMBER 28, 19563 2 P.M. .E.S.T. at the Washington Regional office of the Public Housing • Administration. For bid forms, sales map, property inspection or further information, write or call the office listed below.
public HOUSING administeation, 4th Floor, Longfellow Bldg., 1741 Rhode Island Ave., N.W., Washington 25, D.C. Executive 3-4160, Ext. 4491.
8. Another of the advertisements, also approximately letterhead size, contained a sketch of about 2y2 by 3 inches which showed less detail of Victory Villa but more of the surrounding territory. This advertisement contained in part the following language:
EOK SALE: CHOICE GOVERNMENT OWNED PROPERTY IN ESTABLISHED, EXPANDING BALTIMORE COMMUNITY
INDIVIDUAL LOTS AND LARGER PARCELS WITH TREMENDOUS RESIDENTIAL OR COMMERCIAL POTENTIAL . . . LOCATED IN VICTORY VILLA NEAR GLENN L. MARTIN PLANT
* ■ . * <• ¡it
. Victory Villa is located in the heavily populated residential and industrial area of Middle River. Less than a mile off Highway 40, and a few minutes from Baltimore City limits. Martin Blvd. cuts directly through the community, and several of the parcels front on this main thoroughfare. Although zoned residential now, there is every reason to believe that certain parcels or parts of parcels under consideration have definite and considerable potential commercial use.
jJj sf: :{« # #
The 18 individual lots for sale are scattered throughout the community, and are situated between privately *557 owned and occupied houses. All facilities are readily available, including water and sewerage owned by Baltimore County, ana these lots are ready for immediate construction.
' The other parcels and buildings have extremely■_ attractive terms that have been arranged to fit possible construction or zoning schedules. In each case, the terms facilitate further development by the purchaser. Bidding will be accepted on any one parcel (the 18 lots constitute 18 individual parcels), on any combination of parcels, or on all of the parcels.
9. Neither of the sketches in the advertisements was drawn to scale, nor did either contain a scale of distances or show the metes and bounds of the properties offered for sale.
10. Mr. Melvin Colvin, who, as previously indicated, was a vice president and assistant secretary of plaintiff corporation and who was in charge of acquisition and construction for plaintiff, saw defendant’s advertisements in a newspaper and requested his secretary to write or call the Public Housing Administration for bid forms and other information concerning the property for sale. The evidence does not reveal whether or not the secretary did so, but by letter dated November 26, 1956, Mr. L. H. Blacker, who, as previously indicated, was a vice president of plaintiff corporation, wrote in his capacity as office manager of Victor Posner Developments to the Public. Housing Administration “to send us Bid Forms, Sales Map, and all other information regarding the subject offering” (Victory Villa property). In response to the request, defendant shortly thereafter mailed to Mr. Blacker a sales packet consisting of the general conditions of sale, bid forms, sales maps, and advertising circulars. The advertising circulars were duplicates of the advertisements referred to in findings 7 and 8, supra. The sales maps, about 2 by 2Yz feet in size, showed in detail the various parcels offered for sale, with the streets which bordered them. The sales map showing parcel 2 correctly showed the intervening parcel between parcel 2 and Middle Biver Hoad. Another sales map correctly showed Martin Boulevard bordering one side of parcel 8, but there was no indication on the sales map or in any of the material in the sales packet that parcel 8 had no direct access to Martin Boulevard. Mr. Colvin testified at the trial that although plaintiff received the above-men *558 tioned sales packet prior to plaintiff’s submission of its bid, the sales maps were never shown to him and he did not use the sales maps in preparing plaintiff’s bid. He did, however, prior to plaintiff’s submission of its bid, see the advertising. circulars which were contained in the sales packet received'by •plaintiff'and which were duplicates, of. the advertisements which he had previously seen in a newspaper, and he also examined the bid forms contained in the sales packet.
11. Martin Boulevard, which borders on the northern side of parcel 8 for a total distance of about 1400 feet, is a heavily traveled, 50-mile-an-hour speed limit, four-lane, divided highway running east and west between Route 40, known as Pulaski Highway, and Eastern Boulevard in Baltimore County. It. was built .immediately preceding World War II and was the first limited access road ever built in Maryland. There is a gravel shoulder about 8 feet wide on each side of the concrete strips, and between the gravel shoulders and adjacent property there are storm drain ditches of slight depression. Parcel 8, consisting of 77.22 acres, was at all pertinent times unimproved, heavily wooded, and basically level with Martin Boulevard. There were no fences or barriers between parcel 8 and Martin Boulevard. As previously noted, because of the deed referred to in finding 3, supra, parcel 8 has no direet access to Martin Boulevard. Access to Martin Boulevard from parcel 8 is via Compass Road which joins Martin Boulevard at the northeastern corner of parcel 8. Parcel 8 has access to Compass Road through Fuselage Avenue,.and fronts at varying distances on Yawmeter Drive, Fuselage Avenue, Compass Road, and Orems Road.
12. Before submitting plaintiff’s bid, Mr. Colvin inspected the property at Victory Villa in the company of Mr. Ed Romans, one of his superintendents. Although Mr. Colvin had extensive experience in the purchasing of land for development, he had never previously purchased land from the United States Government. He had, however, bid on land which was held by the United States. Victor Posner Developments, for which Mr. Colvin was the overall manager, was at the time constructing a residential housing *559 development within a half mile of parcel 2 and within a mile of parcel 8. As a result Mr. Colvin was familiar with the general area, including Martin Boulevard, and the several roads with access to it in the general area. Mr. Colvin knew that. opposite parcel 8 on the other side of Martin Boulevard there was a service road[1] running parallel to Martin Boulevard. Mr Colvin also knew that within a period of some 10 years prior to his inspection of the property the Baltimore Baceway, immediately to the north of parcel 8 and adjacent to Martin Boulevard, had gained access to it. Mr. Colvin did not, however, know, nor was it common knowledge, that Martin Boulevard was a limited access highway. Regarding the inspection Mr. Colvin testified in part as follows:
I went out and looked at the property, checked the availability of sewer, walked over the topography, checked it roughly from the advertisement that was in the Evening Sun and also sent to me by the United States Government and * * * read the advertisement, saw the frontage on Martin Boulevard, the approximate frontage on Middle River Road on the two parcels and then figured out what the property was worth after that, based on the advertisement and looking at the property and the locations of it.
13. The testimony of real estate experts at the trial was that, in the real estate business in the State of Maryland when property is said to “front” on a road, it means that the- person owning the property has- unlimited access to the road for the entire distance that the road borders the property. Until after the bids- were submitted, plaintiff did not have actual knowledge that Martin Boulevard was a limited access highway. Mr. Colvin assumed that the language in the advertisement set forth in finding 8, supra, “Martin Blvd. cuts directly through the community, and several of the parcels front on this main thoroughfare * * *” meant that all three of the parcels, including parcel 8, of Victory Villa which Martin Boulevard bordered “fronted” or had unlimited access to Martin Boulevard; and plaintiff’s bid was made on this assumption. Defendant’s con *560 tracting officer who approved defendant’s advertisement was not, however, familiar with the above-mentioned meaning attached by those in the real estate business in the State of Maryland to the word “front.”
14. Prior to submitting plaintiff’s bid, Mr. Colvin checked with the Baltimore County Department of Engineering regarding the location of the sewer lines at Victory Villa; but did not inquire of the Maryland State Boads Commission respecting the access or nonaccess of parcel 8 to Martin Boulevard. The State Boads Commission has records of all of the limited access roads and this information is frequently obtained by telephone inquiries from realtors and builders. Before bidding, plaintiff could have discovered that Martin Boulevard was a limited access highway by checking the land records of Baltimore County; but plaintiff did not do so. It was the intention of Mr. Colvin to attempt to get about 20 acres of parcel 8 which abutted Martin Boulevard zoned commercial with the remaining portion of parcel 8 to be used for houses. Both parcel 2 and parcel 8 were zoned residential but directly across from parcel 8 on the other side of Martin Boulevard there was commercial zoning.
15. Parcel 2, which Mr. Colvin also looked over during his inspection of the Victory Villa property prior to submitting plain! iff’s bid, at all pertinent times was-unimproved land of 24 acres lying some 400 to 650 feet west of Middle Biver Boad which runs north and south. The intervening-parcel was 29.6 acres and, with the exception of a slight depression caused by- a storm drain ditch, was substantially at grade at Middle Biver Boad. There were no fences or markers between Middle Biver Boad and the western boundary of parcel 2. Although parcel 2 does not in fact front on Middle Biver Boad, it does front on other streets. Until after the bids were submitted Mr. Colvin thought that parcel 2 fronted on Middle Biver Boad. This was because of defendant’s advertisement, referred to in finding 7, supra. Before bidding, plantiff could have discovered that parcel 2 did not front on Middle Biver Boad by checking either the land records of Baltimore County or the sales maps which it had received from defendant. Plaintiff did not, however, check the laud records and there is no evidence *561 that plaintiff checked the sales maps prior to the submission of its bid. It was the intention of Mr. Colvin to use all of parcel 2 for houses. Mr. Colvin testified that parcel 2 did not have any commercial possibilities, but that for residential use frontage on Middle River Road would give parcel 2 better access to transportation and utilities.
16. Under date of December 24, 1956, plaintiff submitted to defendant its bid on the bid form which defendant had sent to it. Mr. Colvin prepared plaintiff’s bid but the bid form was signed by Mr. Leonard H. Blacker who, as previously indicated, was a vice president of plaintiff corporation. As will be noted below, plaintiff bid not only on parcel 8 and parcel 2 but also on a section of parcel G which consisted of less than an acre on the southwest corner of Martin Boulevard and Compass Road. The bid form, as filled out and submitted by plaintiff, reads in pertinent part as follows (words and figures filled in by plaintiff are underscored) :
1. The undersigned, hereinafter referred to as the “Bidder”, has been furnished by the United States of America, acting through the Public Housing Administration, a constituent agency of the Housing and Home Finance Agency, hereinafter referred to as the “Seller”, wich [sic] a copy of “General Conditions of Sale for Vacant Land Parcels, Project MD-18099, Middle River, Baltimore 20, Maryland,” hereinafter referred to as the “General Conditions”, setting forth the conditions under which such property will be sold.
2. Bidder offers and agrees to purchase from the Seller the parcel (s) and/or lot(s) identified below and more fully identified in the General Conditions, for cash or on terms as indicated, at the prices shown in the spaces provided, such offer being governed by and subject to the General Conditions covering the sale of such property, which by reference are incorporated in this offer and made a part hereof:

Parcel or Lot No. Price Cash or Terms

1 Sect. 2 Parcel 8 $277,200.00 Terms
2 Sect. 2 Parcel G 5, 010. 00 Terms
3 Sect, 1 Parcel 2 50,100. 00 Terms
4
List parcels in order of preference. If group bids are submitted, attach addendum sheets, listing parcels in desired groups in accordance with the above format. (See Paragraph 3. of General Conditions for more detailed bidding instructions.)
*562 3. The Bidder transmits herewith his certified or cashier’s check or bid bond payable to the order of Public Housing Administration, in the amount of $16,615.50, ■in accordance with Section of the General Conditions.
4. This offer shall be binding upon the Bidder, his (its) successors and assigns, in the maimer and for the period, and may be accepted by the Seller, all as set forth in the General Conditions.
* * =!: * #
7. If this offer or any part thereof is accepted, the deed is to be issued in the name of: (insert name or names of party or parties as they are to be set forth in the ■ deed and note and mortgage note,, if any).
PIBESVILLE HOME BUILDERS, INC.
514 St. Paul Pl. Balto. — 2, Md.
There were no addendum sheets referred to in 2. of the bid form) attached to plaintiff’s bid.
Plaintiff transmitted to defendant a deposit of $16,615.50 which was 5 percent of the total amount ($332,310) which plaintiff bid on the three parcels.
17. The General Conditions of Sale which are referred to in the bid form, and which Mr. Colvin examined prior to submitting plaintiff’s bid, read in pertinent part as follows:
1. Definitions: As the terms are used herein, the following definitions shall apply:
a. The word “Seller” shall mean the United States of America, acting through the Public Housing Administration, Housing and Home Finance Agency.
b. The word “Bidder” shall mean the person, firm or corporation submitting an offer for the purchase of one or more of the parcels.
c. The word “Purchaser” shall mean each successful bidder whose offer is accepted by the Seller for one or more of the parcels.
d. The word “Property” shall mean a parcel or a lot as a unit of sale as set forth in Paragraph 14. of these General Conditions.
2. All persons, firms or corporations desiring to purchase the said Property shall submit their offers in quadruplicate on the form entitled “Offer and Acceptance of Offer to Purchase One or More Parcels of Land, In Middle River, Baltimore County, Maryland”, copies of which will be furnished on request by the Washington *563 Regional Office at Washington, D.C., and all such offers shall be conditioned on, and governed by, the General Conditions of Sale herein set forth.
3. A bidder may bid on one or more parcels. However, the Bidder must designate each parcel bid for and set opposite each the bid amount. In addition, the bidder may designate his choice of parcels or groups of parcels in the order in which he wants them to be considered. If the bidder wishes to submit a bid for a group of parcels he must indicate a price for each parcel, and whether he will accept any part of the group or whether he will accept only the complete group as bid. If the latter information is not clearly indicated in the bid, the Seller reserves the right to accept sucfi bid on all or any portion it may choose. Bids which do not indicate a price for each parcel included in a group bid, may be rejected.
4. Good Faith Deposit. An offer to purchase shall be accompanied by a good faith deposit of 5% of the amount bid but in no event less than $100.00, such good faith deposit to be in the form of a certified or cashier’s check or money order payable to the Public Housing Administration. Such check or money order may be retained by the Seller undeposited at the Bidder’s risk. A bid bond, in a form and made by a surety satisfactory to the Seller, will be accepted in lieu of a certified or cashier’s check or money order as a good faith deposit where the amount of the bid is not less than $100,00.00 [sic]. In the event the Seller fails to accept the offer of the bidder, the deposit or bid bond of the unsuccessful bidder shall be returned.
5. No offer to purchase may be withdrawn for a period of thirty (30) days from the date for opening bids and all such offers shall remain open thereafter until withdrawn. If, after notice of acceptance of any offer has been given, the Purchaser fails to consummate the purchase, the good faith deposit shall be retained by the Seller as liquidated damages 'without prejudice to any further right of action that the Seller may have by reason of the breach and all rights of the Purchaser under his offer and the acceptance by the Seller shall terminate. The Seller reserves the right to reject any or all offers and to waive informalities.
6. Acceptance or rejection of any offer shall be made by depositing notification of such acceptance or rejection in the United States mails addressed to the Purchaser or bidder at the address designated in the offer.
*564 1. Settlement.
a. Subject to the provisions of Paragraph 8, the purchase ana sale of any of the parcels of land shall be closed at the office of the Seller at an hour and on a date to be mutually agreed between the parties, said date (hereinafter called the Date of Settlement) to be not less than thirty (30) nor more than forty-five (45) days after mailing by the Seller of the Acceptance of Offer to Purchase.
b. On the Date of Settlement, the purchase and sale shall be closed in the following manner:
(1) Cash Basis. The Purchaser shall deliver to the Seller a certified or cashier’s check for the balance of the purchase price after application upon such purchase price of the good faith deposit made by the Purchaser.
(2) Term Basis. If the sale is on terms, the Purchaser shall deliver to the Seller a certified or cashier’s check in an amount which; after application thereon of the good faith deposit, will result in a total payment on the purchase price of not less than the percentage shown in Schedule “A”, and shall deliver to the Seller a properly executed Purchase Money Mortgage Note and Purchase Money Mortgage in form prescribed by the Seller, covering the balance of the purchase price, with interest at the rate of five percent (5%) per annum. The payment terms áre set forth in Schedule “A”. Forms of Note and Mortgage in substantially the forms to be executed by the Purchaser may be obtained from the Seller upon request at any time after advertisement.
(3) On the Date of Settlement the Seller shall deliver to the Purchaser a quitclaim deed to the property together with any other documents necessary or required hereunder. The form of quitclaim deed to be used may be obtained from the Seller at any time after the advertisement.
* ‡ * * #
8. Title Information. The Purchaser shall have thirty days from the date of mailing the notice of acceptance to examine the title to the lands which are the subject of his accepted offer and satisfy himself as to the nature of such title. If it is found that the title is not marketable (except for restrictions, covenants or easements of record, compliance with zoning or building codes), and the Seller does not cure the objections thus presented to it by the Purchaser within 60 days thereafter if within its power so to do within such period of time, the Purchaser may withdraw from *565 the purchase of the Property and may obtain a refund of all payments previously made. The failure of the Purchaser to furnish an opinion of a qualified title attorney within said thirty days of mailing notice of acceptance, showing that the title is not marketable (except for restrictions, covenants or easements of record, and compliance with zoning or building codes), shall be deemed to be a waiver on the part of the Purchaser as to all title defects.
9. Disputes. All questions of fact arising hereunder shall be determined by the Seller.
18. Schedule “A” of the General Conditions of Sale reads in pertinent part as follows
schedule “a”
The Project has been subdivided and platted as the Victory Villa Subdivision and the subdivision plat recorded among the Land Eecords of Baltimore County, in Plat Book 22, Folio 97 through 116.
On the plat, copies of which are available for inspection at the Project Sales Office in the Administration Building each sales parcel is identified either by a lot number set off in a circle, or by subdivision parcel number. The parcels offered for sale are identified below and conveyance will be by such lot or parcel number.
* * # * *
II Vacant Land Parcels

Section Parcel No. Acreage Terms Offered

1 2 24.055 25% down, balance payable to 5 years, interest @5% per annum. First two years annual payment of interest only required. Last 3 years, equal annual principal payments plus interest on unpaid balance. Partial releases at fixed acreage values in not less than 5 acre tracts.
1 3-A* 1. 427 (Nursery School Bldg.) 15% down, balance payable in 2Ó equal semiannual installments of principal and interest.
1 3-C* 2.624 25% down, balance payable in 2 years with interest @5% per annum on unpaid balance payable annually.
1 4 3.765 Same as for Parcel 2, except no partial releases.
2 6 0.897 Same as for Parcel 3-C.
2 7 5.639 25% down, balance payable with interest @5% per annum in 4 equal semiannual installments of principal and interest.
2 8 77. 227 Same as Parcel 2, except partial releases at fixed acreages values will be (or not less than 15 acre tracts.
*566 . 19. On Decémber 28, 1956, the bids on Victory Villa were •'opened'by defendant. Plaintiff’s bid of $277,200 was the .highest for parcel 8, with the next two highest bids for parcel 8 being $176,100 and $160,000, respectively. Plaintiff’s bid of $50,100 was the highest for parcel 2, with the-next two highest bids for parcel 2 being $27,600 and $20,550,. •respectively. Plaintiff’s bid on ■ Section 2, parcel G, was. fourth highest.
20. A letter, dated January 8, 1957, to plaintiff from defendant, reads as follows :
Enclosed herewith please find a copy of your offer to purchase certain property at our former Victory-Villa Housing Project, MD-180.99, on the fifth page of , which our. formal acceptance of your offer is indicated.
Settlement of your purchase will be on February 15, 1957, at the Project Administration Building, Compass-Bead and Martin Boulevard, Middle River, Maryland..
We will send you a statement of settlement costs and advise you of the hour of closing sufficiently in advance to permit you to make the necessary preparations.
Enclosed with the letter, in addition to a copy of plaintiff’s-offer, was a document which reads as follows:
NOTICE OP ACCEPTANCE
(Date) January 8,1957'
'TO THE BIDDER ABOVE IDENTIFIED.*
Your offer to purchase parcel (s) 2, Section 1 and 8,. Section 2 located at our Project MD-18099, Middle-River, Baltimore County, Maryland, on a term basis, is hereby accepted.
THE UNITED STATES OF AMERICA public HOUSING ADMINISTRATION
By (Signature) [Illegible]

Director, Washington Regional Office

21. A letter, dated January 11, 1957, from plaintiff to defendant, reads as follows :
Please send us several forms, as prescribed by you,, for the proper execution of the subject papers.
We will require these forms'in connection with our' recent bid, and yoür acceptance of said bids.
Your early attention will be sincerely appreciated.
*567 •22. On January 12, 1957, Mr. Colvin, Mr. Ed Romans, one of his superintendents, and Mr. James O. Armacost, Jr., who was an associate of 'the civil engineering firm of George William Stephens, Jr. and Associates, which did engineering work for plaintiff, inspected the property at Victory Villa. Shortly before the inspection Mr. Armacost procured the record plats which showed the correct location of Middle River Road with respect to parcel 2. This was the first time that this information had come to plaintiff’s attention. At the time of the inspection Mr. Armacost discussed with Mr. Colvin the laying in of a service road on parcel 8 adjacent to Martin Boulevard.
23. On January 14, 1957, Mr. Armacost was informed in a telephone conversation with the assistant engineer of the Maryland State Roads Commission that Martin Boulevard was a limited access highway and that parcel 8 did not have direct access to Martin Boulevard. This was the first time that this information had come to Mr. Armacost’s attention. A letter, dated January 14, 1957, addressed to Mr. Armacost from the assistant engineer of the Maryland State Roads Commission, reads as follows:
This is to verify our conversation of January 14,1957, in which the denied access of Martin Boulevard was discussed.
With the exception of the few established and presently used points of ingress and egress the Martin Boulevard is denied access from the Pulaski Highway, U.S. 40, to Eastern Boulevard, Maryland 150.
Any contemplated developement along this road must be designed using the existing points of access. No additional access will be allowed.
I hope this has answered your inquiry and will guide you in the lay-out of any proposed developement.
24. On the same date, January 14, 1957, Mr. Armacost wrote to Mr. Victor Posner, who was living in Miami Beach, Florida, as follows:
This is the result of an inspection of the property made on foot on Saturday, January 12, 1957 by Mr. Melvin Colvin, Mr. Ed Romans, and myself and the following conclusions were reached. ■ -
On the 77 acres:
1) I have been informed verbally by the State Roads Commission that Martin Blvd. is denied access and I *568 am endeavoring to get a written statement from them to that effect. If access is denied it would be a definite problem for any commercial development along the Blvd., but if the frontage is used for housing, we could probably work traffic circulation out with a service drive which connects to Compass Boad and perhaps talk the State Koads Commission into permitting us a one-way connection off of Martin Blvd., at the north corner of the property.
2) Storm drainage is being contributed from the developed streets around the property, but this is no great problem except along Martin Blvd., because in general the grades falling away from the developed streets and housing is such that the pipe size would be kept down to something approximating 30" pipe.
3) Storm drain contribution along Martin Blvd.,. would be a problem if left in an open ditch, however, Mr. Colvin suggested piping along the narrow portion of the property and then ditching along the remainder keeping the ditch close to the Martín Blvd., until the ditch would junction with the stream at the north corner of the property.
4) Grades are fairly steep, adding to the excavating problem but simplifying the storm drainage problem.
5) Surplus dirt from above grading could be used on the 24 acre parcel.
6) Clearing, about 65 acres at $250.00 per acre.
7) Water, there would be a water assessment and some water problems which would work out as time went on.
8) Sewer, sewer is okay. Some portion of the property might require a right-of-way to reach the outfall sewer but this might not be required depending on the topography, there will probably be a sewer assessment to help pay the cost of the outfall sewer which is not [sic] being built through a portion of the property.
9) Wasteland, by filling the waste-land at the north corner of the property would probably be worked down to approximately 5 for [sic] 6 acres.
On the 24 acres:
1) Property has access to Compass Boad.
2) Storm drainage is a problem with the stream running through the center of the property and flat grade. Mr. Colvin suggested rerouting the stream to the property line and carrying it in an open ditch which would probably eliminate the amount of land lost due to stream.
3) Fill, approximately 13,000 yards of fill would be needed which could probably be gotten from the 77 acre *569 parcel. This fill should eliminate most of the wast-land [sic] along the stream leaving only about 3 acres lost.
4) Water, there would be a water assessment and some water problems which would work out as time went on.
5) Sewer, sewer is okay. There will probably be a sewer assessment to help pay the cost of the outfall sewer which is now being built through a portion of the property.
6) Clearing, 24 acres all wooded, clearing cost per acres would be the same as for the 77 acres.
25. During the period between January 11 and January 14, 1957, Mr. Colvin was informed in a telephone conversation with an official of the Title Guarantee Company that Martin Boulevard was a limited access highway. This was the first time this information had come to Mr. Colvin’s attention.
26. Under date of January 16, 1957, plaintiff filled out a written application form to the Title Guarantee Company for a title insurance policy in the sum of $327,300 “against liens or defects in title affecting the premises hereinafter described * * *”; and described therein the property as:
24.055 Acres Parcel 2 Sec 1, Victory Villa]-™ -,, 77.227 Acres Parcel 8 Sec 2 Victory Villa/™0' üounty
In the application form plaintiff filed in the space opposite “To be settled on” with “Feb. 1st.”
The above application which plaintiff submitted to the Title Guaranty Company was accompanied by two maps which were identical to the sales maps mailed by defendant to plaintiff, and on which Mr. Armacost, plaintiff’s engineer, had made sketches. One of the sketches showed a service drive on parcel 8 adjacent to Martin Boulevard, with lots laid out in parcel 8. The map showing parcel 2 correctly showed the location of Middle River Road with respect to parcel 2.
27. Under date of January 18, 1957, defendant sent to plaintiff a copy of a proposed deed which, if executed, would convey to plaintiff both parcel 8 and parcel 2, and a single mortgage and mortgage note which, if executed, would cover both parcel 8 and parcel 2.
28. A letter, dated January 30, 1957, to plaintiff from defendant,, reads as follows:
*570 With further reference to your offer to purchase certain property at our former housing project Victory Villa, MD-18099, at Middle River, Maryland, we have scheduled settlement of your purchase for Friday, February 15, at 10:00 A.M. in the Project Administration Building at Compass Road and Martin Boulevard. Closing settlement costs will be as follows:
Total purchase price_ $327,300. 00
Good faith deposit_ 16, 615. 50
Mortgage_ 245,450. 00
Balance due___ $65, 234.50
.Taxes — days to 12/31/57_ 357.00
Balance due at settlement_ 65, 591. 50
(payable only by certified check or cashier’s check to the Public Housing Administration)
Be prepared to write two separate checks payable to George L. Byerly, Clerk, in the amounts of $15.00 and $360.25, to cover recording costs and the required State documentary stamps. Also bring with you Federal Documentary stamps in the amount of $360.25. They may be purchased at a Post Office or the Bureau of Internal Revenue. There will be a notary fee of $1.00 payable in cash.
29. A letter, dated January 31, 1957, to plaintiff from the Title Guarantee Company, reads as follows :
We have completed our examination of title to the two fee simple parcels of ground situated in the 15th Election District of Baltimore County, State of Maryland, described as 24.055 acres and 77.227 acres, known respectively as Parcel 2, Section I, Victory Villa, and part of Parcel 8, Section II, Victory Villa, and find the same to be good and marketable as vested in the United States of America.
Taxes on said property have been ordered and will be on hand in time for settlement.
Our policy will be issued subject to the following exceptions:
(1) Rights or claims of parties other than the Insured in actual possession of any or all of the property.
(2) Unrecorded easements, if any, on, above or below the surface; and any discrepancies or conflicts in boundary lines or shortage in area or encroachments, which a *571 correct survey or an inspection of the premises would disclose. _ •
_ ... (3) Possible unfiled mechanics’ and materialmen’s liens.
(4) Subject to the legal operation and effect of a deed from The Title Holding Company to the State of Maryland, to the use of State Eoads Commission of Maryland, dated December 16,1941 and recorded among the Land Eecords of Baltimore County in Liber C.H.K. No. 1216 folio 507 and as shown on State Eoads Commission Plats Nos. 4556 to 4660, inclusive, and subject to the easements for slopes, drainage, etc. as set forth in said deed, as well as the limited access stated therein.
(5) Eights of the County Commissioner of Baltimore County in and to the beds of all streets, roads, avenues, public ways, easements, sewer right of ways, utilities, drains and sanitary sewer easements and also the rights of the Consolidated Gas Electric Light and Power Company of Baltimore in and to the electrical distribution and street lighting systems all as set forth in a quitclaim deed dated March 15, 1956 and recorded among the Land Eecords of Baltimore County in Liber G.L.B. No. 2900 folio 77, from the United States of America.
(6) The northernmost corner of Parcel No. 8 is .subject to a 20 foot sewer right of way easements and the southernmost comer of Parcel 8 is subject to a 15 foot right of way, both as shown on the Plat entitled “Victory Villa — Section II, Parcel Plat”. -
(7) The parcel of ground known as Parcel 2, Section! I, of Victory Villa containing 24.055 acres, is subject to a 50 foot utility drainage easement as shown on the Plat of Victory Villa, Section I, recorded in Plat Book G.L.B. No. 22 folio 97. _
_ We call your attention to the fact that in the deed hereinabove referred to, between The Title Holding Company and State Eoads Commission of Maryland, the Grantor therein, for itself, its successors and assigns, surrendered and released all and every right whatsoever of vehicular ingress and egress between said property, and Martin Boulevard except the limited access points, as set forth in said deed.
Mr. Paul E. Boesch, Eegional Attorney for Public Housing Administration has sent us a copy of a deed, mortgage and mortgage note which will be used in conveying the above mentioned property. So far. we have not- received the original .papers to be executed at settlement.
Settlement may be made at anytime by contacting-our Settlement Department.
*572 • Mr. Colvin testified that upon receipt of the above-quoted letter of January 30,1957, he was satisfied that the title “was good and marketable as far as liens against the property, et cetera, goes, but it was not in accordance with what the government advertised in their advertisement for bid and it was not in accordance with our understanding of the advertisement.”
30. A letter, dated February 4, 1957, to defendant from plaintiff, reads as follows:
This is to inform you that our Attorneys have advised us today that you are not entirely satisfied with the Title to the property that we were the high bidder on, on December 28, in Victory Villa, namely Section 2, Parcel 8 and Section 1, Parcel 2, at which time we paid a deposit of $16,615.50. Our Attorneys feel, at this time, that the Title is not marketable so they have decided to go into the record more thoroughly and we will need another ten (10) days in which to decide whether the Title is good and merchantable in their opinion.
Therefore, for the above reasons we wish to postpone Settlement at this time and we will advise you within ten days if tho Title is good and merchantable in the opinions of our Attorneys.
31. A letter, dated February 7, 1957, to plaintiff from defendant, reads as follows:
Agreeable with your request, we have extended the settlement date to complete the purchase of Parcel 8 of Section 2 and Parcel 2 of Section 1 of the Victory Villa Subdivision to February 25, 1957.
All other terms and conditions of your accepted offer, dated January 8, 1957, to purchase the aforementioned parcels shall remain in full force and effect.
82. A letter, dated February 7, 1957, to defendant from Mr. Harry M. Ashman, plaintiff’s title attorney, reads as follows:
This is to advise you that on behalf of Pikesville Home Builders, Inc., bidder on lots Section 2, Parcel 8, Victory Villa and Section 1, Parcel 2, Victory Villa, accepted by you an January 8, 1957, that the title to said lots is not good and marketable in accordance with the provisions and representations in the prospectus circulated by the seller, the Public Housing Adminis *573 tration, offering the said property for sale, in that it is represented that “Martin Blvd. cuts directly through the community and several of the parcels front on this main thoroughfare.” Section 2, Parcel 8 does not front on this main thoroughfare due to the fact that the former owner has conveyed to the State of Maryland the right of access to said road.
Also, Section 2, Parcel 8 does not contain the acreage represented in the prospectus.
33. A letter, dated February 12, 1957, to Mr. Harry M. Ashman, plaintiff’s title attorney, from defendant, reads as follows:
This is in reply to your letter of February 7, 1957 and with reference to a recent telephone conversation regarding _ marketable title to Parcel 8 of Section 2, Victory Villa Subdivision which, with Parcel 2 of Section 1, is under contract of sale to your client, Pikesville Home Builders, Inc.
As explained to you over the telephone, we see no basis for your claim that title to Parcel 8 is not marketable for the reason that there is no direct access to Martin Boulevard along the northeastern boundary of Parcel 8. The fact that Martin Boulevard is a limited access road is a matter of common knowledge and public record. Your objection to the marketability of title thus pertains to easements and restrictions of record; :which are specifically excepted in Section 8 of the General Conditions made a part of the contract of sale.
The prospectus issued in connection with the sale of various parcels and lots located within the Victory Villa Subdivision merely stated that Martin Boulevard cuts directly through the community and Several of the parcels front on this main thoroughfare. No representations were made or implied that access could be had to Martin Boulevard at any point along its right-of-way. It was incumbent upon the purchaser to ascertain, prior to making an offer, the effects that public roads and other rights-of-way or easements of record would have, upon the property being purchased.
Pursuant to the terms and conditions of your client’s Offer and Acceptance of Offer to Purchase Parcels 8 and 2, dated January 8, 1957, which was modified only as to date of settlement in our letter of February 7, 1957, we will be prepared to close this transaction on February 25,1957.
*574 34. A letter, dated February 13, 1957, to Mr. Harry M. Ashman, plaintiff’s title attorney, from defendant, reads as-follows:
This will supplement our letter of February 12, 1957 and further confirm telephone conversations with respect to the contract of your client, Pikesville Home Builders,. Inc., for purchase of certain lands at our Victory Villa Project MD-18099.
. It is the position of the Public Housing Administration that the title to Parcel 8 of Section 2 of the Victory Villa Subdivision would be marketable even if there were-no access of any kind to Martin Boulevard. As a matter of fact, access to the property may be had through Compass Hoad which bounds the property on the southeast by Fuselage Avenue and by Orems Road, which bounds-the property on the south. Almost immediate access can be had to Martin Boulevard through Compass Road.
While any inability to obtain direct access to the property from Martin Boulevard might affect the value of Parcel 8, it would not render the title to that parcel unmarketable.
85. A letter, dated February 18, 1957, to defendant from Mr. Ashman, reads in part as follows:
This is to advise you that in view of the statements set out in my letter of February 7, 1957 to you, you are advised that on behalf of Pikesville Home Builders, Inc.,, the contract is considered null and void by reason of the-misrepresentations contained in the prospectus and contract.
That a check of the survey shows the. description of Lot No. 8 to be improper and that there is a shortage of land as contained in the prospectus and contract.
In view of the above defects, the title is not considered marketable and, as the contract is deemed null and void, demand is hereby made for the return of the deposit of $16,615.50.
36. A letter, dated February 19, 1957, to Mr. Ashman . from defendant, reads as follows:
This will acknowledge your letter of February 18, advising us that your client, Pikesville Home Builders,. Inc., considers its contract for the purchase of the subject land to be null and void by reason of “the misrepresentations contained in the prospectus and contract.”
As previously explained to you, the prospectus is not a part of the contract and there is no misrepresentation *575 in the contract so far as we are aware. It is requested that you advise us immediately as to the discrepancy alleged in your letter between the acreage of the land as shown in the contract and the actual acreage, and inform us wherein the description of Lot No. 8 is “improper”. This evidence should be in the form of a registered survey and description of the property.
37. A letter, dated February 20, 1957, to Mr. Ashman from defendant, reads as follows:
In reviewing the correspondence with you pertaining to the contract of your client, Pikesville Home Builders, Inc., with the Government xor the subject land, it has been noted that no objections have been raised with respect to Parcel 2 of Section 1, although you have made demand for the return for the full deposit of $16,615.50.
Kindly inform us if it is your position that the contract is null and void with respect to Parcel 2 of Section 1 and whether your client is refusing to proceed with the purchase of this parcel.
38. A letter, dated February 20, 1957, to defendant from Mr. Ashman, reads as follows:
In reply to your letter of February 19, 1957, our position is that the contract is void for the several reasons heretofore specifically set out, and in view of this stand, a further discussion of the matter set forth in the above letter is not beneficial to either of us.
Suit, will be filed within the next few days to recover the deposit made.
39. A letter, dated February 21, 1957, to defendant from Mr. Ashman,-reads as' follows:
In reply to your letter of February 20, pertaining to the above captioned property, it is the position of Pikes-ville Home Builders, Inc., our client, that the contract covering both parcels is one entire contract and cannot be severed. Therefore, one parcel cannot be settled without the other and the demand for the return of the deposit covers both parcels.
40. A letter, dated February 27, 1957, to Mr. Ashman from defendant, reads as follows:
This will acknowledge your letters of February 20 and 21 with further reference to the contract of your client, Pikesville Home Builders, Inc., for the purchase of the subject land. .
*576 In this connection, your attention is called to Paragraph 5 of the General Conditions of Sale incorporated in this contract which reads in pertinent part as follows: “If, after notice of acceptance of any offer has been given, the Purchaser fails to consummate the purchase, the good faith deposit shall be retained by the Seller as liquidated damages without prejudice to’any further right of action that the Seller may have by reason of the breach and all rights of the Purchaser under his offer and the. acceptance by the Seller shall terminate.”
41. After Plaintiff’s refusal to make settlement on parcel 2 and parcel 8, defendant retained plaintiff’s deposit of $16,615.50 and again advertised the properties, but in form differing from the original advertisements.
42. On May 13, 1957, sealed competitive bids for the purchase of parcel 2 and parcel 8 were opened by defendant but defendant rejected all bids on the basis of defendant’s evaluation of the properties and previous offers received. Thereafter, on June 10, 1957, parcel 2 and parcel 8 were sold to the Trailer Village Corporation. Parcel 2, on which plaintiff had previously bid $50,100, was sold for $24,675 arid parcel 8, on which plaintiff had previously bid $277,200, was sold for $182,272. In other words, plaintiff had bid $120,353 more on the two parcels than the amount for which they were sold to the Trailer Village Corporation. Counsel for the parties have stipulated that defendant made a fair effort to obtain the best price for these properties on resale, and that in reselling the properties defendant expended $500 in administrative expenses and $131.88 in advertising, totalr ing $631.88.
•'43. At the trial, plaintiff’s real estate expert, Milton J. Dance, who had been a realtor and appraiser of real estate in Baltimore County .since 1915, and who had done considerable real estate appraisal work in the general area-of Victory Villa, testified that as of December 28, 1956 (the date on which plaintiff’s bid was opened), the value of parcel 8 would be from $3,500 to $4,000 an acre, assuming it to have full access along its eastern boundary to Martin Boulevard and assuming that “part of it would be made commercial”; but that the value of parcel 8 as of December 28,1956, without access to Martin Boulevard would be $2,000 an acre. Mr. Dance further testified that as of . December 28, 1956, *577 the value of parcel 2 would be about $2,000 an acre, assuming it to have frontage on one side on Middle River Road; but that the value of parcel 2 as of December 28, 1956, without frontage on Middle River Road would be $1,500 an acre. Mr. Albert V. Williams, president of the Trailer Village Corporation which, as previously noted, on June 10, 1957, purchased parcel 2 and parcel 8, testified as a real estate expert for defendant. Mr. Williams had been engaged in the construction business in Baltimore County for 22 years and in the real estate business in Baltimore County for 13 years. Mr. Williams testified that if parcel 8 had full access to Martin Boulevard, it would have “some” increase in value. Although the letter dated February 7, 1957, referred to in finding 32, supra, from plaintiff’s title attorney to defendant, states that parcel 8 “does not contain the acreage represented in the prospectus,” there is no evidence to this effect.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in the amount of sixteen thousand six hundred fifteen dollars and fifty cents ($16,615.50), and judgment is entered to that effect.
. It is further concluded that defendant is not entitled to recover on its counterclaim against plaintiff and its counterclaim is dismissed.

 A road running adjacent to a limited access road, principally to serve tlie residents "within the immediate area.

 Repartition of Subdivisión Parcels 3 and 3-A.